**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **SHAREEN RIZVI,** | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 07 C 4412 |
| | ) | |
| **JP MORGAN CHASE,** | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Shareen Rizvi ("Rizvi") alleges discrimination based on national origin (count I) and religion (count II) in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.*, as well as discrimination based on age in violation of the Age Discrimination in Employment Act of 1967 ("ADEA"), 29 U.S.C. § 621 *et seq.* The complaint sets forth hostile work environment, constructive discharge, and disparate treatment claims. Defendant JPMorgan Chase Bank, N.A. ("JPMC") has moved for summary judgment on all counts. For the following reasons, the motion is granted.

I.

Rizvi is a Pakistani Muslim, who was born on July 18, 1960. Rizvi began working for JPMC on September 3, 2003[1] as a senior

_____

[1]Plaintiff attests that, around September 2003, Bank One bought Zurich Life's insurance unit, and JPMC later merged with Bank One. Defendant states, without citing any record support, that JPMC acquired certain Zurich Kemper assets and later Bank One. Plaintiff attests that she was told her "tenure" with JPMC would be

security analyst.  When JPMC acquired Zurich assets, Rizvi was being paid $49,050.00 annually.  In or around February 2004, her title changed to Distributed Computing Analyst II.  JPMC increased her pay to $51,500.00 in April 2004.[2]  Rizvi received a pay increase in February 2005 to $53,560.00.  Rizvi's last day at JPMC was January 6, 2006.

Rizvi attests that she "was always told [she] was doing a good job and received salary increases."  Specifically, Rizvi attests that, at the beginning of 2003, when she reported to someone at Zurich, she received a raise to $49,050.00 after her 2002 review; and, at the end of 2003, Anne Hewitt ("Hewitt"), her director at Bank One, gave her a raise to $51,500.00 after her 2003 review.  Rizvi attests that Hewitt asked her what she wanted to do next, and Rizvi said she was interested in being given the opportunity to work in the Engineering Department.

Rizvi attests that Hewitt sent her to Jeff Link ("Link").  Link is an Infrastructure Senior Manager in the Information Technology ("IT") Department in charge of supervising the Open Systems Analyst II at JPMC's Elk Grove Village Regional Data Center ("RDC").  Rizvi attests that Link interviewed her at the RDC.

_____

considered as of her start date with Zurich Life, which was January 16, 2001.  Defendant claims to have "no knowledge regarding what [plaintiff] was told regarding her official start date for JPMC."

[2]Plaintiff attests that her salary was increased in December 2003, not April 2004.

Rizvi attests that, after asking about her certification and training, Link raised the issue of salary and told her she would get what other people were getting. Link later told Rizvi that she would be working downtown on the night shift rather than at RDC, and she accepted the position.

Shortly after JPMC's acquisition of Zurich assets, Rizvi began working in JPMC's Infrastructure and Operations ("I&O") Group in downtown Chicago. Kevin Onorato ("Onorato") was Rizvi's manager. She worked the midnight to noon ("A.M.") shift.[3] Working at the Chicago facility required Rizvi to commute two hours from her home such that she was away from home from 10:30 p.m. to 2:00 p.m., resulting in her daughter staying out late. She reported this to Onorato, who moved her to the P.M. shift,[4] which is from noon to midnight. Onorato spoke to Link about transferring Rizvi to the RDC, which is only fifteen minutes from her home. Onorato told Rizvi he could not promise the P.M. shift at the RDC.

Rizvi attests that "[l]ater [she] inquired again about [her] salary." She attests that she had been advised that employees working a twelve-hour day "were entitled to a shift differential increasing their salary over employees who did not work 12 hours." Rizvi attests that she asked Onorato what her salary would be, he said that he was not sure and he would talk to "HR." Rizvi attests

---

[3]Plaintiff refers to the A.M. shift as the "night" shift.

[4]Plaintiff refers to the P.M. shift as the "day" shift.

that she then moved to the RDC. She further attests that she never brought up the issue of pay adjustment after her "departmental change of responsibilities[.]"

On or about May 1, 2004, Rizvi transferred from the downtown location to the RDC. Jeff Lang ("Lang") is an Infrastructure Manager in the IT Department. Lang was Rizvi's supervisor at the RDC. The transfer was an accomodation so Rizvi could be closer to home. Upon being transferred to the RDC, Link told Rizvi there were no P.M. shifts available so she would have to work the A.M. shift. Rizvi was able to leave home at 11:30 p.m. to get to work on time for the A.M. shift. Rizvi was able to get home more quickly - in about twenty to twenty-five minutes - after her shift and to use her lunch break to go home to check on her daughter. None of her managers ever had a problem with her going home on her lunch break, and no one complained about it.

Between July and November 2004, Rizvi had a conversation with Link requesting the P.M. shift. According to Rizvi, Link did not think he would fill a recently vacated P.M. shift position, and Rizvi did not observe anyone fill that position. According to Rizvi, a second P.M. shift position was vacated, but Link filled it with contractors - not a JPMC employee. On December 6, 2004, Rizvi e-mailed Link requesting to be moved to the day shift so she could better monitor her daughter. On January 21, 2005, Rizvi e-mailed Link again requesting a transfer to the day shift. In February

2005, Patricia Woodley ("Woodley"), Bill Watling ("Watling"), Jim Kinkade ("Kinkade"), and Tom Ryan ("Ryan") moved to Rizvi's department.  Sometime thereafter, Link moved Rizvi to the day shift on a temporary basis.

On June 16, 2005, Rizvi e-mailed Link and copied Lang, acknowledging that the transfer to "days" was temporary, advising that it is not possible for her to work the night shift, and asking what other options he could suggest at the RDC.[5]  After approximately six weeks on the day shift, Link told Rizvi that she would have to return to the night shift or find another job.  The parties also cite a June 20, 2005 e-mail from Link to Rizvi, which states

> . . . August 15th will be your last day on the current
> Noon to Midnight shift rotation.  This gives you
> approximately eight weeks to do one of a couple things:
>
> • make the appropriate arrangements for your personal
>   situation that would allow you to work midnight to
>   noon
> • apply for and accept another position within the
>   corporation
> • consider resigning from the organization
>
> Please understand that I do not want you to have to
> resign from the organization.  Let me know if there is
> anything I can assist you with during your job search.
> If you have any issues or concerns that still need to be
> addressed, come talk to me or call me anytime.[6]

---

[5]The parties agree that this e-mail was dated June 16, 2005, although the date is not apparent from the document.

[6]Plaintiff attests: "I was advised of options but not of options given to other employees.  I was never advised what amount of time I would be given.  I continued to inquire about a position

Rizvi testified that she did not have any facts to suggest Link gave her these options[7] because of her age, religion, or national origin.  Rizvi testified that she asked Link on August 9, 2005[8] whether she would be working the night shift the next week as she did not "have any arrangements[,]" and Link said no because he had been "talking to HR[]" and they were "working [something] out." She also testified that as of August 15, 2005,[9] she was not taken off the P.M. shift.  Rizvi continued working on the P.M. shift until she left JPMC, when she "got sick" and "stopped going to work."  She never went back to the A.M. shift.

Ryan, a Distributed Computing Engineer in the IT Department, was Rizvi's team lead at the RDC from sometime in 2005[10] to January 6, 2006.  As team lead, Ryan managed Rizvi and provided her with work assignments.  Rizvi provided her team lead with the status of

---

as I had seen other workers get day assignments but I was not given one."

[7]Although it is unclear from the portion of plaintiff's deposition cited, the testimony appears to be about the options set forth in the June 20, 2005 e-mail.

[8]Plaintiff's testimony does not specify the year, but it does not appear to be disputed.

[9]Plaintiff's testimony does not specify the year, but it does not appear to be disputed.

[10]Defendant states that Ryan began as plaintiff's team lead in about June or July 2005, but fails to cite any record support. Plaintiff testified that Ryan became her supervisor around August or September 2005; she also attests that Ryan became her team lead in September 2005.

all of her projects. Rizvi claims that Ryan micromanaged her, meaning he questioned everything she did like she was a child he was babysitting. Rizvi also claims that Ryan did not scrutinize her colleagues' work to the same extent. Ryan never made a comment to Rizvi about her age, religion, or national origin. Rizvi was not aware of any comments made by Ryan regarding her age, religion, or national origin. While at JPMC, no one in a supervisory position ever made a comment to Rizvi about her age, religion, or national origin.

Around the fall or winter of 2005, Morollo Faulkner ("Faulkner") overheard Ryan say that it would be a good Christmas present to get rid of Rizvi. Rizvi was not present. Faulkner did not recall anyone responding to Ryan's comment. After that comment, Faulkner heard Ryan say that it was his personal goal to get rid of Rizvi. Rizvi was not present. Faulkner never saw Ryan mistreat Rizvi or treat her differently than anyone else. Faulkner never heard Ryan make any comments about Rizvi or the quality of her work to anyone in management. Faulkner never heard anyone working at the RDC make any derogatory comments about Rizvi related to age, religion, or national origin.

Ryan did not have the authority to "directly" fire Rizvi or people in her department. Rizvi testified that Ryan gave feedback to Link or Lang about her performance, upon which her review was based. Link and Lang were the decisionmakers regarding Rizvi's

performance, raises, and annual reviews.

On Rizvi's 2004 performance review, Link rated her as "Needs Improvement" in the "Technology & Operations Acumen" category. Lang met with Rizvi as follows: on July 21, 2005 for a mid-year review; on September 26, 2005 as a result of an incident involving a server; on November 5, 2005 as a result of Rizvi opening a server to remote access; and on January 6, 2006 for a year-end review. Rizvi received her 2005 performance review on January 6, 2006. Link rated her overall performance as "Needs Improvement[.]" Rizvi rated herself as "Needs Improvement" in the "Communication" category. After receiving her 2005 performance review, Rizvi never returned to work.

Rizvi was not fired. She left on a medical leave on January 6, 2006 and never returned. On January 7, 2006, Rizvi went to the doctor because she felt "very weird." She was given "some medication just to relax[.]" The following Thursday, January 12, 2006, Lang called and asked Rizvi to get on-line to sign her 2005 performance review. When connecting her laptop, she again began not feeling well, and her daughter took her to the hospital. Later that day, Rizvi was admitted to the hospital for one week. She was then treated for another week as an outpatient.

Rizvi was approved for medical leave from January 6, 2006 through April 23, 2006, and she was expected to return to work on April 24, 2006. She did not return on April 24, 2006. On May 4,

2006, JPMC's assistant general counsel notified Rizvi's counsel that Rizvi was scheduled to return to work on April 24, 2006, but had not done so. The letter informed Rizvi's counsel that, if Rizvi failed to return to work or explain her absence, then her employment would terminate on May 15, 2006.

There was no point between January 6, 2006 and May 14, 2006 when Rizvi could have gone back to work because she was not psychologically up to it. Rizvi attests that, when she "drove by the RDC location [she] started feeling the same anxiety and same negative thoughts[]" so she returned home. She realized that she could not tolerate the anxiety, so she informed her attorney that she would like to resign. Rizvi began working for the Tribune Company on May 14, 2006. There was no period of time after Rizvi's disability benefits ended and before her new job began when she did not have an income.

When Rizvi began working for JPMC, she did not have to disclose her religion, but it was common knowledge that she was Muslim because she took prayer breaks, fasted during Ramadan, and did not eat sausage when pizza was ordered. Rizvi also attests that she offered to work on Christmas so her teammates could enjoy the holiday with their families. Lang did not preclude Rizvi from using her breaks to pray, and he did not make any disparaging comments to her about taking the time to pray. Lang also permitted

Rizvi to leave work early to observe a Muslim holiday.[11] No one in a management or supervisory role ever said anything negative to Rizvi about her religion, practicing her religion, taking time to pray, or anything of that nature.

JPMC states that, of Woodley, Watling, Kinkade, and Ryan, three were Computing Engineers - not Computing Analyst II like Rizvi.[12] JPMC also states that the Computing Engineer title requires more computing, technical, and business solution expertise than the Computing Analyst II title.[13] Rizvi identified Woodley,

---

[11]Defendant cites an April 26, 2006 e-mail from Lang, in which he wrote that Rizvi did not give him prior notice of the holiday, and he subsequently asked her to let him know in advance next time. Plaintiff attests that she "provided him with significant Muslim dates that [she would] be taking half shift off . . . . "

[12]Defendant cites a document it refers to as "2005 Roster of Departmental Employees," about which no testimony or affidavit has been provided. I cannot discern what the document is, when it was dated, or the significance of the job descriptions. The "Jobcode Desc" listed for Ryan, Watling, and Woodley is "DIST COMPUTING ENGINEER[,]" and it is "Dist Computing Analyst II" for Kinkade and Rizvi. To the extent plaintiff attests about Woodley's, Ryan's, Dean Vukus', Jim Patykowski's, and Watling's titles and promotion dates, she has not established that she has personal knowledge. Defendant states that Kinkade was promoted to Computing Engineer in February 2006, citing a document it refers to as "2006 Roster of Departmental Employees" about which no testimony or affidavit has been provided. Again, I cannot discern what the document is, when it was dated, or the significance of the job titles. It lists Kinkade's "Position Title" as "DIST COMPUTING ENGINEER[.]"

[13]Defendant cites documents it refers to as "September 29, 2005, Job Descriptions for Distributed Computing Engineer and Distributed Computing Analyst II," about which no testimony or affidavit have been provided. Although I cannot discern how the positions are ranked, plaintiff does not dispute that the engineer title is more advance than the analyst title. Rather, she attests that she was qualified for the engineer position.

Watling, and Ryan as similarly-situated younger employees who were treated more favorably.[14]

Rizvi attests that, after approximately one year at the RDC, she learned from the company's intranet website that the salary range for her analyst position was $53,600.00 to $70,000.00 per year, and the minimum salary for an engineer position was $70,000.00 per year. Rizvi attests that her salary was $51,500.00 even though she "was actually doing duties of both jobs, analyst and engineer." Rizvi also attests that she raised the issue of salary with Link, who said he would talk to HR, after which her salary was adjusted to the bottom of the analyst salary range. Rizvi further attests that she "was working in the role of Engineer and fulfilling the responsibilities of Engineer but [her] title and pay were never adjusted accordingly."[15]

Prior to January 6, 2006, Rizvi never told anyone in a management or supervisory role that she believed she was being paid less based on her age, religion, or national origin. Rizvi testified that Ryan and Watling were similarly situated non-Pakistani non-Muslim employees who she assumed were paid more based on their titles, but she was "doing the same kind of job." In her affidavit, Rizvi cites to the "2005 Roster of Departmental

---

[14]Neither party specifies Woodley's, Watling's, and Ryan's ages.

[15]In her affidavit, plaintiff cites exhibits in such a manner that I cannot determine to what she refers.

11

Employees," listing other employees with the same title - Kinkade, Faulkner, and Damien Edwards ("Edwards") - making more than her.[16]

Prior to January 6, 2006, Rizvi never told anyone in management or human resources ("HR") that she believed she was being discriminated against based on her age, religion, or national origin. Rizvi testified that, after January 6, 2006, she talked to Laine Heit ("Heit") in HR about her 2005 performance review, with which she was displeased. Rizvi initially testified that she did not tell Heit that she got a bad performance review because of her age, religion, or national origin. But Rizvi subsequently testified that she told Heit that anything negative in her performance evaluation was based on her age, religion, and national origin. Rizvi also attests that, when she spoke to Heit, she "told her that at RDC it is a hostile environment for [her] and [Heit] said with raised voice that [she] was wrong."

## II.

Summary judgment is appropriate where the record shows that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)). A genuine issue for trial

---

[16]She also attests that Kinkade is forty-six years old, Faulkner is thirty-six years old, Edwards is twenty-four years old, and she is forty-five years old. The birth dates listed in the document are as follows: Kinkade, 12/15/1959; Faulkner, 5/28/1970; Edwards, 10/25/1981; and Rizvi, 7/18/1960. The document also lists the following birth dates: Woodley, 12/14/1969; Watling, 12/3/1978; and Ryan, 10/22/1964.

exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The movant initially bears the burden of "identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323.

Once the movant has met this burden, the non-movant "may not rest upon the mere allegations or denials of the adverse party's pleading," but rather "must set forth specific facts showing that there is a genuine issue for trial." FED. R. CIV. P. 56(e)(2). Affidavits "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on the matters stated." FED. R. CIV. P. 56(e)(1). A plaintiff cannot create an issue of material fact by submitting an affidavit that contradicts earlier deposition testimony. *Pourghoraishi v. Flying J, Inc.*, 449 F.3d 751, 759 (7th Cir. 2006) (citation omitted). I must construe all facts in the light most favorable to the non-movant and draw all justifiable inferences in favor of that party. *See Anderson*, 477 U.S. at 255.

III.

A. Hostile Work Environment

The complaint alleges that Rizvi was subjected to a hostile

work environment, resulting in her needing medical treatment. (Compl. ¶ 19.) JPMC argues that Rizvi cannot demonstrate that Ryan's micromanaging her and his comments constituted a hostile work environment, citing no supporting legal authority. Rizvi does not separately address the hostile work environment claim.

To succeed on a hostile work environment claim under Title VII,[17] a plaintiff must demonstrate that: (1) she was subject to unwelcome harassment; (2) the harassment was based on a protected characteristic; (3) the harassment was severe and pervasive so as to alter the conditions of her environment and create a hostile or abusive working environment; and (4) there is a basis for employer liability. *Atanus v. Perry*, 520 F.3d 662, 676 (7th Cir. 2008) (citation omitted). Employees are protected against conduct that is sufficiently severe or pervasive that a reasonable person would find it hostile, and that the victim herself subjectively sees as abusive. *Andonissamy v. Hewlett-Packard Co.*, 547 F.3d 841, 847 (7th Cir. 2008) (quotation omitted). I must examine the circumstances, including the frequency and severity of the conduct, whether it is threatening or humiliating or merely an offensive utterance, and whether it unreasonably interferes with the plaintiff's performance. *Andonissamy*, 547 F.3d at 847; *Atanus*,

---

[17]The Seventh Circuit has assumed without deciding that a plaintiff may bring a hostile work environment claim under the ADEA. *Racicot v. Wal-Mart Stores, Inc.*, 414 F.3d 675, 678 (7th Cir. 2005).

520 F.3d at 676.  The threshold for plaintiffs is high; to be actionable, a workplace must be hellish.  *Whittaker v. N. Illinois Univ.*, 425 F.3d 640, 645 (7th Cir. 2005).

Rizvi claims that Ryan micromanaged her by questioning everything she did.  Rizvi also contends that she was not given shift assignments that others were given.  Rizvi additionally relies on Ryan's comments.

I first address the comments.  Faulkner overheard Ryan say that it would be a good Christmas present to get rid of Rizvi, and that it was his personal goal to get rid of Rizvi.  Rizvi does not claim that these comments relate to her national origin or age, but suggests that the comment about getting rid of her being a Christmas present refers to her religion.  It is undisputed that Rizvi was not present when Ryan made the foregoing comments.  It is undisputed that neither Ryan nor any other supervisor ever made a comment to Rizvi about her age, religion, or national origin.  It is also undisputed that Rizvi was not aware of any comments Ryan made about her age, religion, or national origin.  Because Ryan's comments were made outside of Rizvi's presence and there is no evidence that she was aware of the comments while at JPMC, they do not support a hostile work environment claim where the rest of the conduct at issue is isolated and not particularly severe.[18]  *See id.*

---

[18]Additionally, even if the one remark relates to plaintiff's religion, she has not shown that the comment alone constitutes more than an offensive utterance.

The remaining conduct is not severe. Rizvi has not demonstrated that Ryan's close supervision was sufficiently severe or pervasive that a reasonable person would find it hostile. Even if Rizvi had adduced facts showing she was denied the shifts she wanted,[19] she also has not shown that such conduct is so severe or pervasive so as to be objectively hostile. Therefore, I grant summary judgment for JPMC on the hostile work environment claim.

## B. Constructive Discharge

The complaint alleges that Rizvi was forced to resign. (Compl. ¶¶ 21, 23.) JPMC argues that, as Rizvi cannot prove a hostile work environment, she cannot prove a constructive discharge. Rizvi contends that a jury could find she was constructively discharged based on having to continue to be supervised by Ryan "who vowed to terminate her[,]" being denied shift assignments "routinely" given to others, and "not being paid as her co-workers were." (Pl.'s Resp. at 19.) To advance a constructive discharge claim, a plaintiff's working conditions must be even more egregious than the high standard for a hostile work environment claim because an employee is expected to remain

_____

[19]Rizvi was told she was not guaranteed the P.M. shift at the RDC, but transferred there nonetheless. Upon arriving at the RDC, no P.M. shifts were available. Rizvi subsequently requested a vacated P.M. shift, which Link did not fill. When a second P.M. shift was vacated, it was filled with contractors rather than a JPMC employee. After further requests, Rizvi was moved to the P.M. shift on a temporary basis. She remained on that shift for the duration of her employment at JPMC.

employed while seeking redress. *Roney v. Illinois Dep't of Transp.*, 474 F.3d 455, 463 (7th Cir. 2007) (quotation omitted). Because I find that Rizvi was not subject to a hostile work environment, her claim of constructive discharge is automatically foreclosed. *Id.* Moreover, Rizvi has not set forth any conditions at JPMC that would be considered so intolerable that a reasonable person would have felt compelled to resign. *Id.* (quotation omitted).

### C. Disparate Treatment

Rizvi asserts that she was subject to different treatment than other JPMC employees in terms of salary and work assignments. (Pl.'s Resp. at 15; *see* Compl. ¶¶ 10-15, 27, 33, 39.) In a Title VII or age discrimination case, a plaintiff may show discrimination under either the direct or indirect methods of proof. *Atanus*, 520 F.3d at 671. Regardless of under which method a plaintiff proceeds, she must show that she suffered a materially adverse employment action *Nichols v. S. Illinois Univ.-Edwardsville*, 510 F.3d 772, 779 (7th Cir. 2007). Adverse employment actions extend beyond readily quantifiable losses, but not everything that makes an employee unhappy is actionable. *Nagle v. Vill. of Calumet Park*, 554 F.3d 1106, 1116 (7th Cir. 2009) (quoting *Nichols*, 510 F.3d at 780). Actionable materially adverse employment actions include the following categories of cases: (1) the employee's compensation, fringe benefits, or other financial terms of employment are

diminished, including termination; (2) a nominally lateral transfer with no change in financial terms of employment significantly reduces the employee's career prospects by preventing the use of her skills and experience; and (3) the employee is not moved to a different job or the skill requirements of her present job altered, but the conditions in which she works are changed so as to subject her to a humiliating, degrading, unsafe, unhealthful, or otherwise significantly negative change in her work environment. *Id.*

Under the direct method, the plaintiff may rely on direct or circumstantial evidence. *Nichols*, 510 F.3d at 781. Direct evidence proves the fact in question without reliance upon an inference or presumption. *Id.* Circumstantial evidence allows the trier of fact to infer intentional discrimination. *Id.* Circumstantial evidence includes: (1) suspicious timing, ambiguous oral or written statements, or behavior toward or comments directed at other employees in the protected group; (2) evidence, whether or not rigorously statistical, that similarly situated employees outside the protected class received systematically better treatment; and (3) evidence that the employee was qualified for the job in question but was passed over in favor of a person outside the protected class and the employer's reason is a pretext. *Atanus*, 520 F.3d at 672 (quotation omitted). The focus of the direct method is whether the evidence points directly to a discriminatory reason for the employer's action. *Id.* at 671-72

(citation omitted).

Under the indirect method, a plaintiff may create a presumption of discrimination by establishing a *prima facie* case of discrimination. *Id.* at 672. This presumption shifts the burden to the defendant to produce a legitimate nondiscriminatory reason for its actions. *Id.* If the defendant satisfies its burden, then the burden shifts back to the plaintiff to show that the explanation was pretextual. *Id.* To establish a *prima facie* case of discrimination under Title VII or the ADEA, the plaintiff must show that: (1) she belongs to a protected class; (2) she performed her job according to her employer's legitimate expectations; (3) she suffered an adverse employment action; and (4) her employer treated similarly situated employees outside the protected class more favorably. *Id.* at 672-73. Summary judgment is appropriate if the plaintiff fails to establish any of the elements of the *prima facie* case. *Id.* at 673 (citation omitted).

### 1.Materially Adverse Employment Action

JPMC argues that Rizvi fails to establish a materially adverse employment action because a negative performance review does not constitute an adverse employment action. Rizvi does not clearly specify a materially adverse employment action. A low performance rating alone does not constitute an adverse employment action. *Boumehdi v. Plastag Holdings, LLC*, 489 F.3d 781, 790-91 (7th Cir. 2007). A constructive discharge would constitute an adverse

employment action, but, as set forth above, has not been established here. *See id.* at 791.

The denial of a raise constitutes a material adverse action. *Id.* at 790-91. But Rizvi does not actually assert that she sought and was denied a raise. And the evidence taken in the light most favorable to Rizvi shows that, after Rizvi spoke to Link about her salary, it was raised to the bottom of the analyst salary range. Rizvi also does not contend that her pay ever decreased. Rather, she claims that she should have been paid more because she was qualified to be and performed as an engineer, but she was not paid accordingly. Rizvi has not shown that not being paid more constitutes a materially adverse employment action. Additionally, to the extent Rizvi's complaint that she was treated less favorably in terms of work assignments refers to the shift to which she was assigned, she has not shown that working the A.M. as opposed to the P.M. shift involved a change in the terms or conditions of her employment or significantly reduced her career prospects. *See Nagle*, 554 F.3d at 1116-17.

Because Rizvi has not shown a materially adverse employment action occurred, she has not adduced sufficient evidence to support her disparate treatment claims. *See Nichols*, 510 F.3d at 781. Moreover, as explained below, Rizvi also has not presented sufficient evidence under the direct or indirect methods.

2. Direct Method

Rizvi proceeds under the direct method regarding her claim of religious discrimination, relying on circumstantial evidence. (*See* Pl.'s Resp. at 12-14.) First, Rizvi argues that non-Muslims were given higher salaries and more desirable work assignments. Second, she argues that Ryan - who was in charge of daily assignments - commented that firing her would be a Christmas present, which "showed his bias against Plaintiff based on her religion and showed that he intended to use that difference in taking adverse job actions against Plaintiff." (*Id.* at 12.)

I first address the comment. "[I]solated comments that are no more than 'stray remarks' in the workplace are insufficient to establish that a particular decision was motivated by discriminatory animus." *Hemsworth v. Quotesmith.com, Inc.*, 476 F.3d 487, 491 (7th Cir. 2007) (quotation omitted). "[A] particular remark can provide an inference of discrimination when the remark was (1) made by the decision maker, (2) around the time of the decision, and (3) in reference to the adverse employment action." *Id.* (citation omitted). Assuming Ryan was a decisionmaker - or he effectively controlled a decisionmaker[20] - and the comment was temporally close to Rizvi's pay not being increased or Rizvi not

---

[20] *See Brewer v. Bd. of Trs. of the Univ. of Illinois*, 479 F.3d 908, 917 (7th Cir. 2007) (explaining that, where employee without formal authority to materially alter terms and conditions of plaintiff's employment uses singular influence over employee with such power to harm plaintiff for discriminatory reasons, actions of employee without formal authority are imputed to employer).

being assigned to the shift she wanted, Rizvi still has not connected the comment to the complained of actions (or inactions). Taking the evidence in the light most favorable to Rizvi, Ryan provided feedback that formed the basis of her performance review. But Rizvi has not presented any evidence that she was denied a salary increase or shift transfer based on Link's, or anyone else's, reliance on a negative performance review or any other feedback from Ryan about her performance.

As far as non-Muslim employees earning more, Rizvi must present some evidence that similarly situated employees received systematically better treatment. Taking the evidence in the light most favorable to Rizvi, Ryan and Watling are non-Muslim engineers making more than her, and Kinkade, Faulkner, and Edwards are analysts making more than her. Rizvi has only adduced evidence regarding these employees' salaries and titles. It is undisputed that the engineer and analyst positions differ, and that the engineer position is more advanced. Regardless of Rizvi's assertion that she was qualified to be and performed as an engineer,[21] she has not presented any comparative evidence about the other employees.

Summary judgment for JPMC is also appropriate because Rizvi has not established discrimination under the direct method.

---

[21]Plaintiff has not presented any specific evidence regarding her qualifications or the work she performed.

### 3. Indirect Method

Rizvi proceeds under the indirect method regarding her claims of religious, national origin, and age discrimination. (Pl.'s Resp. at 14-19.) It is undisputed that Rizvi is a member of protected classes, but JPMC argues that Rizvi cannot establish that she was performing up to its reasonable expectations, that she suffered an adverse employment action, or that similarly situated employees outside the protected classes were treated more favorably. Rizvi first argues that a question of fact exists as to whether she was meeting JPMC's expectations. She also argues that a question of fact exists as to whether JPMC treated similarly situated employees outside the protected classes more favorably in terms of salary and assignments.

Rizvi has not raised a question of material fact regarding whether she was performing according to JPMC's reasonable expectations. JPMC contends that Rizvi was not meeting its expectations based on her 2005 performance evaluation, which rated her overall performance as needing improvement and in which she rated herself as needing improvement in the communication category. JPMC also relies on meetings Lang had with Rizvi during 2005, two of which related to apparent performance issues. Rizvi states that the 2005 performance review "is disputed and at odds with prior reviews and salary increases and statements by supervisors asking that she not resign her position even during the period of her last

performance review." (*Id.* at 15.) Rizvi testified that she told Heit the negative review was based on her age, religion, and national origin. Taken in the light most favorable to Rizvi, her 2004 performance review indicated that she needed improvement in the technology and operations acumen category. No prior reviews or other evidence of past performance besides Rizvi's affidavit are in the record, but even the fact that prior supervisors indicated Rizvi was doing a good job does not create a question of fact as to whether she was meeting JPMC's expectations in 2005. Also, Link's mid-year e-mail stating that he did not want Rizvi to resign is not necessarily inconsistent with a year-end assessment that her overall performance needed improvement.

Rizvi also has not shown that the analysts or engineers who she identifies as earning more than her were similarly situated. A similarly situated employee is directly comparable to the plaintiff in all material respects. *Boumehdi*, 489 F.3d at 791 (quotation omitted). To determine whether employees are similarly situated, I consider whether: they had the same job description; were subject to the same standards; had the same supervisor; and had comparable experience, education, and other qualifications. *See id.* (citation omitted). The evidence taken in the light most favorable to Rizvi shows that Ryan and Watling are non-Pakistani non-Muslim engineers making more than her, and Kinkade, Faulkner, and Edwards are analysts making more than her. Rizvi also

identifies Woodley, Watling Ryan, Kinkade, Faulkner, and Edwards as younger.[22] As set forth above, Rizvi has only adduced evidence about the employees' salaries and titles, not any other comparative factors. For example, Rizvi has not presented any evidence that the engineers or the analysts were similarly situated to her in terms of experience, education, or other qualifications.

Summary judgment for JPMC is also appropriate because Rizvi has not presented a *prima facie* case of discrimination under the indirect method.

IV.

For the foregoing reasons, JPMC's motion for summary judgment on all counts is granted.

ENTER ORDER:

_____
**Elaine E. Bucklo**
United States District Judge

Dated: May 19, 2009

---

[22]On an ADEA claim, it is plaintiff's burden to establish that the comparator is "substantially younger," which generally means ten years younger. *Nagle*, 554 F.3d at 1118 (citing *Balderston v. Fairbanks Morse Engine Div. of Coltec Indus.*, 328 F.3d 309, 321-22 (7th Cir. 2003)). Thus, not all of the younger employees identified necessarily qualify as substantially younger, but at least Edwards and Watling do.